Filed 6/22/16  P. v. Turner CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>DION TURNER,<br><br>        Defendant and Appellant. | B258994<br><br>(Los Angeles County<br>Super. Ct. No. TA127048) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Laura R. Walton, Judge.  Affirmed.

        Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

Defendant and appellant Dion Turner raises multiple issues following his conviction of two counts of second degree robbery with firearm use enhancements (Pen. Code, §§ 211, 12022, subd. (a)(1), 12022.53, subd. (b)).[1] For the reasons discussed below, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Prosecution Case

*A.   Percipient Witness Testimony*

On September 6, 2011, Evelyn Moore and her sister-in-law, Chanera Miller, were working at Noah's Tobacco Store (Noah's), located at 11119 South Main Street, Los Angeles.  Noah's sold cigarettes, jewelry, candy, soda, and adult entertainment products.  At about 5:00 p.m., two masked men dressed in black or dark blue ran into the store.  Moore could not see the men's faces, but she could see their eyes and mouths. The men closed the door to the store.  One of the men ran behind the counter and told Miller to put merchandise and cash into a duffle bag.  The other man stood by the door with a gun.  The gunman repeatedly threatened Moore, saying, "Don't look up.  Don't look at me."  The gunman instructed Moore and Miller to remove the tapes from the store's surveillance system, but Miller said she did not know how to do so.  Instead, the men broke the video players containing the tapes.[2]

Lamont Dees was parked in front of Noah's when the robbery occurred.  He saw two men dressed all in black run into the store.  A few minutes later, he realized the door to the store was locked, which he thought was odd because he knew the store was open for business.  Dees moved his car to the side of the store and tried calling and texting the store's owner.  He also called 9-1-1.  Ten or 15 minutes later, he saw the two men run out of Noah's, carrying "a duffle bag or a black bag of some sort."  One of the men may have

---

[1]   All subsequent statutory references are to the Penal Code.

[2]   A surveillance video of the robbery was played for the jury.  The jury was also given a transcript of the dialog heard on the video.

2

been carrying a weapon. Dees saw the two men get into a Cadillac that "looked like . . . they took it off the showroom . . . . It was immaculate. It had a yellow license plate that said 'A1' on it." Dees followed the Cadillac for about a block and a half, until he was directed by the 9-1-1 operator to stop. He then returned to the store and spoke to the police officers who had arrived on the scene. The officers asked Dees to try to describe the robbers, but he was not able to. Subsequently, the officers drove Dees by an apartment building where the Cadillac was parked, and he identified the vehicle as the one he had seen drive away from Noah's.

Los Angeles Police Department (LAPD) Detective Francis Coughlin and Officer Dean Monteleone were the first officers to respond to the report of a robbery in progress at Noah's. They secured the store, spoke to witnesses, and notified Detective John Parra, who assumed responsibility for the investigation. They then received a report that the get-away car had been spotted in the parking lot of an apartment building near 111th Street and Broadway, about a quarter mile from Noah's. Detective Coughlin, Officer Monteleone, and others set up surveillance of the car. When defendant drove the car away from the apartment several hours later, the officers followed, made a traffic stop, and arrested defendant. At the time of his arrest, defendant was wearing a white t-shirt, dark Levis, and white shoes.

The arresting officers were instructed to bring the car to the police station for processing. Officer Monteleone drove the car to the station, where it was searched by Detective Parra. Inside the car, Detective Parra found defendant's driver's license and wallet, paperwork indicating that defendant owned the car, and two ski masks.

At about 9:00 p.m., Detective Parra executed a search warrant of defendant's apartment, located at 11111½ South Broadway. In the kitchen and living room of the apartment Detective Parra found letters and bills in defendant's name, two black shirts, a duffle bag, a loaded .44-caliber revolver, tobacco items, and a receipt indicating that defendant serviced the Cadillac at a Jiffy Lube on September 6, 2011, at 3:21 p.m., about an hour and a half before the robbery. On the apartment's landing, Detective Parra found a second duffle bag and a bed sheet containing tobacco items, adult toys and DVD's,

3

jewelry, a damaged video surveillance system, and a wallet containing Chanera Miller's college identification card. In one of the bedrooms, he found a bed covered with a sheet that matched the sheet recovered from the apartment's landing.

Detective Parra had the revolver seized from the apartment dusted for prints. No usable prints were discovered. Detective Parra testified this is not unusual because "[n]ormally, when you are holding a gun, you hold it by the handle, and the handle is usually serrated or has a grip on it so it doesn't slip out of your hand. So the surface where you normally hold the gun will have, basically, ridges or something that makes the grip that much easier, so normally you wouldn't get any fingerprints from that."

Detective Parra also reviewed the surveillance videos recovered from Noah's. The clothing worn by the gunman appeared to match the shirts recovered from defendant's living room. The height and weight of the gunman appeared consistent with defendant's height and weight. The jeans worn by the gunman appeared consistent with those worn by defendant at the time of his arrest.

Detective Parra showed the items recovered from the apartment to Evelyn Moore, who identified them as merchandise stolen from Noah's. Detective Parra also showed Moore a "six pack" photographic line-up and asked whether she could identify anyone; based on the face shape, eyes, and mouth, she tentatively identified two photographs, one of which was of defendant. Subsequently, after hearing defendant speak at the preliminary hearing, Moore told Detective Parra that she recognized the defendant's voice as the voice of the gunman. At trial, when Moore was asked whether she had any doubt that defendant's voice was that of the gunman, Moore said, "It's the same voice."

B.      *DNA Evidence*

The LAPD crime lab tested a reference DNA sample provided by defendant against DNA recovered from the eye and mouth openings of the two ski masks found in defendant's car and from the revolver found in defendant's apartment. Samantha Tosch, an LAPD criminalist, concluded that the major DNA profile obtained from the eye and mouth openings of one of the masks (item no. 4) matched defendant's DNA profile. That DNA profile would be expected to occur in approximately one in 35 sextillion unrelated

4

individuals.[3]  Defendant's DNA did not appear on the other ski mask (item no. 3).  With regard to the revolver, Tosch concluded that defendant was not the major DNA contributor, but she could not make any conclusions about the identity of minor contributors because there was too little genetic material to analyze.

Based on the DNA evidence, Tosch could not say with certainty that defendant was the only person who wore the ski mask with his DNA on it.  She also could not say with any certainty whether defendant had handled the revolver.

## II.

## Defense Case

A.      *Scientific and Expert Witness Testimony*

Ronald Guzek, an audio and video expert, reviewed videos of the robbery and took photographs of defendant in prison.  Guzek compared the body types of defendant and the gunman, and concluded that the gunman appeared to be about eight percent larger than defendant and to have broader shoulders.

Virginia Sadl, a forensic serologist with a private DNA laboratory, performed DNA testing of the two ski masks.  Initially, she swabbed the interior and exterior areas of the ski mask designated as item no. 4, with the exception of the eye and mouth openings.  In those areas, Sadl found DNA from at least four people, of which defendant was a possible contributor.  Sadl then took samples from the eye and mouth areas of the same mask.  Those areas contained DNA from at least two people, of which defendant was a possible major contributor.  Sadl said that the chance that a randomly selected, unrelated person would be similarly included as a major contributor was approximately one in 1.3 sextillion.  If defendant had worn the mask on numerous occasions in the past, that "could explain" the presence of his DNA in the eye and mouth areas.  Sadl said that if someone else had worn the mask for a short period of time, it is "possible" that they would show up as a minor contributor to the DNA in the eye and mouth areas.

---

[3]      A sextillion is a one followed by 21 zeros.  Thirty-five sextillion is five trillion times the human population of the Earth.

5

Mehul Anjaria owns a consulting group that helps criminal defense lawyers and inmates understand complicated DNA evidence. Anjaria did not disagree with any of the conclusions reached by the LAPD crime lab with regard to the DNA evidence in this case. She said that if an individual has worn a ski mask several times, DNA can build up on the mask. A DNA test cannot determine how long DNA has been present on an item, and it cannot differentiate between different kinds of cellular material. If two people wear a ski mask for the same length of time, they will almost certainly leave behind different amounts of DNA because individuals shed DNA at different rates. The DNA testing in this case did not establish that defendant was the only person, or the last person, to wear the ski mask on which his DNA was found.

### B.     *Police Witness Testimony*

Detective Sonny Patsenhann testified that he collected evidence, including two ski masks, from a Cadillac STS on September 6 or 7, 2011. The Cadillac was driven from 101st and Broadway, where LAPD took custody of it, to the police station, and subsequently was towed from the station. Detective Patsenhann also collected evidence, including a revolver, from defendant's apartment. Detective Parra authored the report describing the evidence collected from these locations. Detective Patsenhann's serial number appeared on Detective Parra's report because he located the revolver.

Detective Patrick Flaherty testified that he was familiar with a man named Devin Williams, whom he had arrested for possession of cocaine. Detective Flaherty said Williams was a member of the 11 Deuce Broadway Gangster Crips (Gangster Crips). Defendant asked whether Williams used the 11111 South Broadway apartment to "facilitate gang activity"; Flaherty said he had been told that was the case, but he could not independently confirm it. Flaherty agreed that the Cadillac STS was also associated with Williams.

On cross examination, Detective Flaherty said that as of September 6, 2011, he was assigned to a gang impact team. He was aware that Noah's and the apartment at 11111 South Broadway were located in territory claimed by the Gangster Crips. He knew that defendant was a member of the Gangster Crips and was known by the moniker

"8 Ball." Detective Flaherty said he had known members of the Gangster Crips to share vehicles, and that if one member of a gang drove another's car, it did not mean ownership had been relinquished. He also said it was common for gang members to share or use the same apartment, and that the apartment at 11111 South Broadway was a "crash pad" for the Gangster Crips. Detective Flaherty was certain that at the time of the robbery, defendant was still an active member of the Gangster Crips.

### C. *Percipient Witness Testimony*

Keith Reese has known defendant for more than 20 years. He testified that he saw defendant at his tattoo shop on September 6, 2011, from about 4:45 p.m. to at least 6:00 p.m. In January 2014, Reese was convicted of making felony criminal threats and being a felon in possession of a firearm.

Gerald Mathis has known defendant for at least 12 years. He did carpentry work at defendant's tattoo shop, Off the Way, on September 6, 2011, from about noon until about 6:00 or 6:30 p.m. Defendant left the shop only once, from about 3:00 to about 4:00 p.m., to get lunch. At about 5:30 p.m., Mathis stepped out to smoke a cigarette and noticed that defendant's car was gone. Mathis asked defendant for a ride home, but defendant said he could not give him a ride because his car was gone.

## III.

## Verdict and Judgment

The jury convicted defendant of two counts of second degree robbery (§ 211), and made true findings that in the commission of the robbery, defendant was armed with a firearm (§ 12022, subd. (a)(1)) and personally used a firearm (§ 12022.53, subd. (b)). In a bifurcated proceeding, the court found the prior conviction allegations, as amended, to be true, and sentenced defendant to 40 years to life in state prison.

Defendant timely appealed.

## DISCUSSION

## I.

## The Trial Court Did Not Abuse Its Discretion by Admitting
## Evidence That Defendant Was a Member of a Gang

Defendant contends that the trial court erred by allowing Detective Flaherty to testify that defendant was a member of the Gangster Crips. He urges the gang evidence was irrelevant because it "was not logically connected to any material issue in dispute." Further, he says, the evidence was highly inflammatory and, therefore, was more prejudicial than probative. For the reasons that follow, we do not agree.

### A. Legal Standards

"Gang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative. (Evid. Code, §§ 210, 352; *People v. Carter* (2003) 30 Cal.4th 1166, 1194; *People v. Ruiz* (1998) 62 Cal.App.4th 234, 239-240; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449.) . . .

"However, gang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' (*People v. Sanchez, supra*, 58 Cal.App.4th at p. 1449; *People v. Ruiz, supra*, 62 Cal.App.4th at p. 240.) In cases not involving a . . . gang enhancement, it has been recognized that 'evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.]' (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Bojorquez* (2002) 104 Cal.App.4th 335, 345.) Even if gang evidence is relevant, it may have a highly inflammatory impact on the jury. Thus, 'trial courts should carefully scrutinize such evidence before admitting it. [Citation.]' (*People v. Williams* (1997) 16 Cal.4th 153, 193; *People v. Carter, supra*, 30 Cal.4th at p. 1194 [evidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged, and must be carefully scrutinized]; *People v. Gurule* (2002) 28 Cal.4th 557, 653.)

"A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 547; *People v. Carter*, *supra*, 30 Cal.4th at p. 1194; *People v. Waidla* (2000) 22 Cal.4th 690, 723.) The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.)" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192-193.)

    B.    *Analysis*

In the present case, defendant's primary argument to the jury was that he was not the masked gunman who robbed Noah's. In support, he elicited testimony from Detective Flaherty that Devin Williams, a member of the Gangster Crips, was known to use defendant's car and apartment to facilitate gang activity. Thereafter, over defendant's objection, the prosecutor was permitted to elicit testimony that defendant was a member of the Gangster Crips and was known by the moniker "8 Ball." The prosecutor further was allowed to elicit testimony that Detective Flaherty had known members of the Gangster Crips to share vehicles; that if one member of a gang drove another's car, it did not mean ownership of the car had been relinquished; that it was common for gang members to share or use the same apartment; and that the 11111 South Broadway apartment was a "crash pad" for the Gangster Crips.

Defendant contends that the evidence that he was a member of the Gangster Crips was irrelevant and inflammatory, and therefore that it should have been excluded. The court considered a similar issue in *People v. Jordan* (2003) 108 Cal.App.4th 349. There, defendant Jordan was arrested in the stairwell of an apartment complex frequented by gang members and used for drug sales. Where Jordan had been seated in the stairwell, the arresting officer found a plastic baggie containing six smaller bags of cocaine base. (*Id.* at p. 354.) During his trial for drug possession, Jordan presented numerous witnesses who testified that individuals other than Jordan had sold drugs at the apartment complex immediately prior to Jordan's arrest. Specifically, an individual named Ford admitted that he and another man sold drugs at the apartment complex, and that both the Rolling

9

20's and the Insane Crip gangs sold drugs there. (*Id*. at p. 365.) Following this testimony, the court permitted the prosecutor to present rebuttal evidence that Jordan was affiliated with a gang. (*Ibid*.)

On appeal, Jordan contended the gang evidence was not probative of any facts in dispute because he had not been charged with selling drugs on behalf of a gang and never sought to prove he was not a gang member. The appellate court disagreed: "[A]lthough the trial court initially ruled gang evidence inadmissible, during the defense portion of the case Jordan presented evidence indicating gang members sold drugs in the area of the apartment complex. The prosecutor was entitled to rebut the inference, created by Jordan's defense, that the drugs found in the stairwell belonged to one of the gang members, not Jordan. Had the defense not sought to demonstrate that individuals other than Jordan were responsible for the drug sales at the apartment complex, the gang evidence would have remained inadmissible pursuant to the trial court's initial ruling. Jordan's defense opened the door to this rebuttal evidence. The trial court properly could conclude the probative value of the gang evidence increased during presentation of the trial to the point where it outweighed the risk of undue prejudice. Thus, no error appears in the admission of the gang evidence." (*People v. Jordan*, *supra*, 108 Cal.App.4th at pp. 365-366.)

The present case is analogous to *People v. Jordan*. As in that case, defendant in the present case suggested through his questioning of witnesses that unknown gang members were responsible for the illegal actions for which defendant was being tried. Specifically, defendant elicited testimony from Detective Flaherty that Devin Williams had access to defendant's apartment and car, giving rise to the inference that it was Williams—an individual with a criminal record and known ties to the Gangster Crips— who was responsible for placing the ski masks in defendant's car and the stolen items in defendant's apartment. Once defendant thus "opened the door," the prosecutor was entitled to rebut the inference through evidence that defendant was *himself* a member of the Gangster Crips—and thus that defendant, not Williams or an unknown gang associate, likely was the masked gunman. On these facts, as in *Jordan*, the trial court

10

properly concluded that the probative value of evidence that defendant was a member of the Gangster Crips outweighed the risk of undue prejudice.

Defendant urges us to adopt the analysis of *People v. Avitia*, *supra*, 127 Cal.App.4th 185, in which the court found that the trial court erred in admitting evidence of defendant Avitia's gang membership. In that case, Avitia was convicted of discharging a firearm in a grossly negligent manner and of possessing an assault weapon. Over Avitia's objection, the prosecution was permitted to elicit testimony that there was gang graffiti in Avitia's bedroom. (*Id*. at pp. 191-192.) The Court of Appeal held that the trial court abused its discretion by admitting testimony that gang graffiti was observed in Avitia's bedroom: "The crimes were not alleged to be gang related. . . . The only theory upon which the evidence appears to have been admitted was that it tended to link the firearms with Avitia. But no such link was apparent from Deputy House's testimony. House did not testify about the nature or content of the gang graffiti on the posters. There was no showing that Avitia was named in the graffiti, either by his real name or a nickname of 'Chivo.' There was no showing any of the guns were referenced in the graffiti. There was, therefore, no evidentiary link between the gang graffiti and the ownership of the guns. The gang evidence was completely irrelevant to any issue at trial." (*Id*. at pp. 193-194.)

The present case is distinguishable from *Avitia* in significant ways, most notably in that defendant in the present case, unlike defendant Avitia, actively disputed his connection to the ski masks, the revolver, and the items stolen from the tobacco store. Moreover, unlike in *Avitia*, defendant's membership in the Gangster Crips gang tended to link him to these incriminating items because defendant had established through Detective Flaherty's testimony that members of the Gangster Crips had access to defendant's apartment and car and used the apartment to facilitate criminal activity. The court's analysis in *Avitia*, therefore, is not relevant to our conclusion here.

Defendant contends finally that the gang evidence was cumulative because Detective Flaherty's testimony had already established a connection between defendant and Williams, through Williams's use of defendant's car and apartment. We do not agree

11

that the evidence was cumulative. From Detective Flaherty's answers to defendant's questions, the jury reasonably could have concluded that defendant had not voluntarily allowed Williams to use his car and apartment, but had been coerced by Williams and the Gangster Crips into doing so. Detective Flaherty's testimony that defendant was *himself* a member of the Gangster Crips dispelled any such inference, casting Williams's use of the car and apartment in an entirely different light.

## II.

## Denial of *Pitchess* Motion

### A.    *Overview*

Prior to trial, defendant filed a *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*)), with regard to Detective Parra, Detective Patsenhann, Officer Coughlin, and Officer Monteleone. The motion sought information regarding complaints made against the officers related to coercion, falsifying police reports, and perjury. Defendant's declaration in support of his *Pitchess* motion stated as follows: (1) Detective Patsenhann "signed a CHP 180 form stating that he towed my vehicle, but from the in[-]car camera my car was driven by Officer Coughlin," (2) two ski masks were planted in defendant's car, and (3) Detective Parra falsely stated in his written report that officers found marijuana on defendant's person.

At a pretrial hearing, the court noted that in his written motion defendant had not specifically alleged any wrongdoing by Officer Monteleone, and it asked whether defendant was asserting any such wrongdoing. Defendant said he included Officer Monteleone in the *Pitchess* motion because he did not know who wrote the arrest report. He did not identify any wrongdoing he attributed to Officer Monteleone.

The court then asked defendant who he believed planted the ski masks in defendant's car and marijuana on his person. Defendant said he believed Officer Coughlin planted the ski masks in his car, noting that Officer Coughlin had driven his car to the police station. With regard to the marijuana, defendant initially said he believed Detective Parra falsely claimed to have found marijuana on his person; however, on further questioning by the court, defendant said Officer Coughlin did so:

12

"The Court: Does Detective Parra say that he found the marijuana on you, or another officer found the marijuana on you? [¶] . . . [¶]

"Defendant Turner: . . . [H]e said that Officer Coughlin.

"The Court: So he said Officer Coughlin found it?

"Defendant Turner: Yes, I think.

"The Court: But Parra just wrote the report?

"Defendant Turner: Yes.

"The Court: Okay. So then you are really alleging that Coughlin planted – found marijuana on you, but actually didn't –

"Defendant Turner: Yes, ma'am. [¶] . . . [¶]

"The Court: . . . And in [Detective Parra's] report, I'm assuming that he said Coughlin searched you, and Coughlin found the marijuana on you; is that correct?

"Defendant Turner: Yes.

"The Court: Was Parra present when Coughlin searched you and claimed to find the marijuana?

"Defendant Turner: At that time, ma'am, I don't know. I don't know. I don't know. I don't know if he was present."

The court granted the *Pitchess* motion as to Detective Patsenhann and Officer Coughlin, but denied it as to Officer Monteleone and Detective Parra. The court said defendant had not alleged any specific acts of misconduct by Officer Monteleone, and while it understood that Detective Parra wrote an arrest report, "he was just writing in his supplemental report information given to him by Officer Coughlin. That information being that Officer Coughlin was the one that allegedly found marijuana on [defendant's] person during the time of [defendant's] arrest and/or detention."

Defendant contends on appeal that the trial court erred by limiting its in camera review to the personnel files of Detective Patsenhann and Officer Coughlin, urging that the court also should have ordered review of the personnel files of Detective Parra and Officer Monteleone. For the reasons that follow, we find no error.

13

*B.    Relevant Legal Principles*

On a showing of good cause, a criminal defendant is entitled to discovery of relevant documents or information in the confidential personnel records of a peace officer who is accused of misconduct against him.  (*People v. Gaines* (2009) 46 Cal.4th 172, 179; *People v. Samuels* (2005) 36 Cal.4th 96, 109.)  "To initiate discovery, the defendant must file a motion supported by affidavits showing 'good cause for the discovery,' first by demonstrating the materiality of the information to the pending litigation, and second by 'stating upon reasonable belief' that the police agency has the records or information at issue.  [Citation.]"  (*Warrick v. Superior Court* (2005) 35 Cal.4th 1011, 1019 (*Warrick*); *Sisson v. Superior Court* (2013) 216 Cal.App.4th 24, 33-34; *People v. Moreno* (2011) 192 Cal.App.4th 692, 701.)  If a defendant shows good cause, the trial court examines the material sought in camera to determine whether disclosure should be made, and discloses "only that information falling within the statutorily defined standards of relevance."  (*Warrick*, at p. 1019; *Moreno*, at p. 701.)

"There is a 'relatively low threshold' for establishing the good cause necessary to compel in camera review by the court.  [Citations.]"  (*People v. Thompson* (2006) 141 Cal.App.4th 1312, 1316; *Warrick*, *supra*, 35 Cal.4th at p. 1019.)  Defendant's declaration must describe a specific and plausible factual scenario that would support a defense claim of officer misconduct, propose a defense to the pending charges, and articulate how the discovery sought might be admissible or lead to relevant evidence. (*Warrick*, at p. 1024; *Garcia v. Superior Court* (2007) 42 Cal.4th 63, 71; *Thompson*, at p. 1316.)  "A scenario sufficient to establish a plausible factual foundation 'is one that might or could have occurred.  Such a scenario is plausible because it presents an assertion of specific police misconduct that is both internally consistent and supports the defense proposed to the charges.'  [Citation.]"  (*Thompson*, at p. 1316, italics omitted; *Warrick*, at p. 1026.)  Depending on the facts of the case, "the denial of facts described in the police report may establish a plausible factual foundation."  (*Thompson*, at p. 1316; *Warrick*, at pp. 1024-1025.)  A defendant need not establish that it is reasonably probable his version of events actually occurred, provide corroborating evidence, show that his

14

story is persuasive or credible, or establish a motive for the officer's alleged misconduct. (*Warrick*, at pp. 1025-1026; *Thompson*, at pp. 1316-1317.)

Trial courts are vested with broad discretion when ruling on *Pitchess* motions (*Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086), and we review a trial court's ruling for an abuse of discretion. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 992; *Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1039.)

C.      *No Good Cause for In Camera Review of Detective Parra's Records*

Although he concedes that Officer Coughlin, not Detective Parra, claimed to have found marijuana on his person,[4] defendant urges that he was entitled to *Pitchess* review of the records of both officers because Detective Parra authored the arrest report that described the discovery of the marijuana.

The court considered a similar issue in *People v. Hill* (2005) 131 Cal.App.4th 1089 (*Hill*), disapproved of on other grounds in *People v. French* (2008) 43 Cal.4th 36, 48, fn. 5. In *Hill*, following the defendant's arrest for weapons-related offenses, defendant sought *Pitchess* discovery as to the arresting officers. In support of the *Pitchess* motion, defense counsel stated in a declaration that the officers' report "is false. [Defendant] did not possess a gun nor did he point a gun at [the officers]. He did not fire a weapon." (*Hill*, at pp. 1096-1097.) The trial court denied the *Pitchess* motion, noting that the gun allegations in the police report came from civilian witnesses, not the officers themselves. The Court of Appeal affirmed: "The trial court properly recognized that defendant's showing in support of his *Pitchess* motion established only that there was a factual dispute between defendant's version of events and that of [the civilian witnesses]. . . . Defendant's showing was insufficient to satisfy the materiality aspect of *Pitchess*." (*Hill*, at p. 1099.)

The present case is analogous to *Hill*. Like the officers in *Hill*, Detective Parra included in his arrest report statements made by someone else—here, Officer Coughlin's statements that he discovered marijuana on defendant's person after his arrest. The

---

**4**      This was consistent with Officer Coughlin's trial testimony that he (Officer Coughlin) recovered marijuana from defendant's person following defendant's arrest.

15

attribution of marijuana to defendant, therefore, was by *Officer Coughlin*, not Detective Parra. As in *Hill*, therefore, defendant's declaration in support of his *Pitchess* motion established a factual dispute between defendant's version of events and Officer Coughlin's, *not* Detective Parra's. The trial court therefore did not abuse its discretion in concluding that defendant's showing was insufficient to satisfy the materiality aspect of *Pitchess*.

We reach the same conclusion regarding defendant's contention that he met his *Pitchess* burden as to Detective Parra "by alleging that the ski masks were planted in [defendant's] car." Defendant told the court that while Detective Parra wrote the report describing the discovery of the ski masks, he believed Officer Coughlin, not Detective Parra, planted the ski masks in his car. Again, therefore, defendant's declaration in support of his *Pitchess* motion established a factual dispute between defendant's version of events and Officer Coughlin's, not Detective Parra's. Any prior acts of dishonesty by Detective Parra, therefore, would not be relevant to the reported discovery of the ski masks in defendant's car.

### D. *No Good Cause for In Camera Review of Officer Monteleone's Records*

Defendant's declaration in support of his *Pitchess* motion did not specifically allege any wrongdoing by Officer Monteleone. The trial court noted this at the pretrial hearing and asked whether defendant was alleging any such wrongdoing. Defendant said he included Officer Monteleone in the *Pitchess* motion because he did not know who wrote the arrest report, but he did not identify any wrongdoing he attributed to Officer Monteleone.

Defendant asserts on appeal that he showed good cause to review the files of Officer Monteleone because defendant asserted during the pretrial proceedings that "the ski masks had been planted in his car" and "Officer Monteleone was present during his arrest." Not so. Defendant did not assert during the *Pitchess* hearing that he believed Officer Monteleone had planted the ski masks in his vehicle; to the contrary, he said he believed Officer Coughlin had done so. On this record, the trial court did not abuse its discretion in finding no good cause to review the files of Officer Monteleone.

16

# III.

## The Trial Court Did Not Abuse Its Discretion in Denying Funding
## for Eyewitness Identification and Police Procedures Experts

### A. *Legal Standards*

" 'An indigent defendant has a statutory and constitutional right to ancillary services reasonably necessary to prepare a defense. [Citations.] The defendant has the burden of demonstrating the need for the requested services. [Citation.] The trial court should view a motion for assistance with considerable liberality, but it should also order the requested services only upon a showing they are reasonably necessary. [Citation.] On appeal, a trial court's order on a motion for ancillary services is reviewed for abuse of discretion. [Citations.]' (*People v. Guerra* (2006) 37 Cal.4th 1067, 1085; see § 987.9, subd. (a).)" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1255, abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

Defendant contends that trial court abused its discretion by denying his requests for additional funding to retain an eyewitness identification expert and a police procedures expert. For the reasons that follow, we find no abuse of discretion.

### B. *An Eyewitness Identification Expert Was Not Reasonably Necessary to the Defense*

#### 1. Factual Background

Defendant, who had been granted pro se status, asked the court to fund an eyewitness identification expert. The court asked whether any of the prosecution witnesses claimed to be able to identify defendant; when the prosecutor said none did, the court denied defendant's request for an identification expert, stating as follows: "Mr. Turner, it's your burden. . . . It does not appear an identification expert is necessary to your defense. According to the People, they do not have any witnesses that they plan on calling that will take the stand and identify you as the person who committed the alleged crimes, which we call eyewitness testimony. [¶] Their statement [is] that they do have and they are calling witnesses who were witnesses or victims of the crime, but they say that the witnesses are going to indeed say . . . that . . . [the] two people who

17

committed the crime [were] wearing . . . ski mask[s]. And so unless I have further information, the court is going to deny your request for an identification expert."

The prosecutor then clarified that one of the victims had tentatively identified two of six photographs as potentially depicting the gunman. The court said its ruling was unchanged: "There was no identification when [the victim] picks out . . . two people in that six pack and says it can either be you or – and this is based on the eyes and mouth. She did not identify you. She picked out two individuals and said it can be either you or the other person. . . . [¶] So without more, I'm not going to grant an eyewitness identification expert."

        2.    <u>Analysis</u>

Our Supreme Court has explained that the decision to permit expert testimony on psychological factors affecting eyewitness identification "remains primarily a matter within the trial court's discretion." (*People v. McDonald* (1984) 37 Cal.3d 351, 377, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914.) Such expert testimony is appropriate, the court has said, "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability." (*McDonald*, at p. 377.) However, such evidence "will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*Ibid*.)

The court applied this principle in *People v. Lewis and Oliver*, *supra*, 39 Cal.4th at pp. 995-996, holding that the trial court did not abuse its discretion in refusing to grant the defendant funds to retain an eyewitness identification expert. It noted that expert testimony on the psychological factors affecting eyewitness identification is often unnecessary, and for this reason, the trial court's discretion regulating its use is rarely disturbed. In the case before it, the court said defendant had not shown that such testimony would have made a difference because "[*n*]*o witness identified the masked perpetrators*. The prosecution relied on circumstantial evidence showing defendants' motive, intent, and opportunity to commit the crime, and their consciousness of guilt

18

afterwards. . . .  The record does not show what additional exculpatory inferences could have been drawn if an expert had testified."  (*Id*. at pp. 995-996.)

In the present case, as in *People v. Lewis and Oliver*, the trial court did not abuse its discretion in concluding that an eyewitness identification expert would not have been helpful to defendant's defense.  Lamont Dees testified that he was not able to clearly see the face of either robber and, although Detective Parra asked him to try to describe the suspects, he was not able to do so.  Indeed, he testified that he could not say "what they [the suspects] looked like, their face, age, race, or anything."  Evelyn Moore testified that she could not clearly see either suspect's face because both were wearing masks.  When she was shown a "six-pack" of photographs, she tentatively identified two of the photos based on the eyes and mouth, but was not able to conclusively identify either one.[5]

On this record, defendant's claim fails because he does not show how the proposed expert testimony "would have made a difference" in his trial.  (*People v. Lewis and Oliver*, *supra*, 39 Cal.4th at p. 995.)  That is, "[t]he record does not show what additional exculpatory inferences could have been drawn if an expert had testified." (*Id*. at p. 996.)  Moreover any error in denying defendant's request for funds to hire an eyewitness identification expert was harmless.  Defendant was the registered owner of the get-away vehicle, in which his driver's license and wallet—as well as two ski masks—were found.  The stolen merchandise and a gun matching the description of the gun used during the robbery were found in defendant's apartment.  Evelyn Moore testified unequivocally that she recognized defendant's voice as that of the gunman. And, defendant was arrested wearing the clothing that matched that of the gunman. Accordingly, defendant has failed to establish that he was deprived of a fair trial or

---

[5]  On appeal, defendant suggests (without citation to any legal authority) that an expert would have helped defendant cross-examine Moore not only regarding her identification of him in the photographic lineup, but also "her *voice identification* in court."  (Italics added.)  Defendant did not seek funding for a voice identification expert in the trial court, and thus he has forfeited the issue on appeal. (E.g., *People v. Townsel* (2016) 63 Cal.4th 25, 42 [defendant forfeited appellate issue by failing to raise it in the trial court].)

19

otherwise suffered prejudice from the denial of his request for funds. (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1086; *People v. Mendoza* (2000) 24 Cal.4th 130, 159.)

       C.     *A Police Procedures Expert Was Not Reasonably Necessary to the Defense*

       1.     Factual Background

On November 21, 2013, defendant requested funding to hire a police procedures expert to assist him in reading "MDT's."[6] The court denied the request, noting that defendant's investigator was a former Compton police officer and could assist him in reading the MDT's. Defendant then said he wanted the assistance of a police procedures expert to advise him about LAPD procedures for transporting an impounded car. The court denied that request as well, stating: "[W]hether your car was towed or not towed or should have been towed, that is not crucial to your case for which you are facing multiple robbery counts . . . or at least you don't spell [out] how it's crucial to your case whether they followed the proper procedures of towing your car or not towing your car . . . ."

Defendant later filed a supplemental motion for a police procedures expert, arguing that an expert would be necessary to help him establish that "police and detectives on this case did not follow proper police procedures in investigating and collecting and handling evidence in this case." At the hearing on the motion, defendant stated that he believed a police procedures expert was relevant because officers said "items were found in the car that had to do with DNA. I'm alleging that they were not in the car." The court denied the motion, explaining as follows: "[A] police procedures expert cannot assist you with factual issues. They [say they] found items. You allege the items were not found. A police procedures expert does not assist you – that's a factual issue. [They said items were] found. You say [they were] not found. That is something for a jury to determine. You don't need a police procedure expert for that determination."

---

**6**     A "MDT," or mobile data terminal, is a computerized device used in emergency vehicles, including police cars, to communicate with a central dispatch office.

2.    Analysis

Defendant contends that a police procedures expert would have helped him establish that the arresting officers violated LAPD evidence procedures (1) by driving defendant's car to the police station, rather than towing it, and (2) in the manner in which the ski masks were collected and processed.  Such a showing, he urges, would have suggested that the ski masks were planted in his car by the arresting officers.

We do not agree.  The fact that defendant's car was driven to the police station does not lead logically to the conclusion that evidence therefore was planted in it—nor would towing defendant's car have foreclosed that possibility.  Similarly, even were evidence collection procedures violated in some fashion, that would not have suggested that the ski masks were planted.  The trial court did not abuse its discretion by denying defendant's request for a police procedures expert.  And, as we have said, the evidence of defendant's guilt was overwhelming; thus, any error in this regard was not prejudicial.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.

We concur:


LAVIN, J.                                                    HOGUE, J.[*]

_____

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21